## Markwell et al. v. Addington.

December 17, 1946.
Rehearing denied Feb. 18, 1947.

John B. Anderson for appellants.
Otto C. Martin for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Reversing.

On September 12, 1945, Addington, Markwell and Blades entered into this contract:

"This contract or agreement made and entered into on the above date, between E. M. Addington, party of the first part, and Markwell and Blades, parties of the second part.

"Party of the first part (Addington) hereby agrees to sell at a lump price all stock of merchandise, and furnish building and lot located in Island, Ky. (Here follows description.)

"Party of the first part to furnish fixtures such as shelving, desk, paint counter, one spring and one platform scales, air grease press, one steel battery rack, one steel tire rack, two heating stoves, and one cash register, for Forty Dollars ($40) per month, payable in advance.

"Second party to keep in repair all equipment and furnish any new equipment they want hereafter, and to return all equipment in good condition with building as received.

"Second party to take good care of building, and lot and not damage or destroy in any way same, and to pay for any damage to same other than regular wear.

"Second party is to use Standard Oil Company's gasoline, kerosene, greases and oils, exclusively, and no other brands are to be sold until September 5, 1955.

"Party of the first part and his wife are to have the right to buy anything they want at any time wholesale through their described business known as the Nu Hardware & Service Station and are to pay cash and not cause party of the second part any trouble and expense. All agencies such as Owensboro Wagon products, Grosley's Corp. products, Blount Plow Works products, Motrola products, Maytag products, Armour fertilizer products, Dixie Foundry products, are to remain as property of the Nu Hardware & Service Station or its place of business described herein.

"Second party is not to sub-rent, lease or offer in any way to dispose of property, equipment, or stock of merchandise without first parties' consent or approval.

"First party shall have the first chance to buy stock of merchandise when sold for the purpose of vacating building.

"Second party to have the first chance to buy the building if sold while occupied."

Appellants upon its execution took possession and began business. On March 1, less than six months thereafter, appellees were served with written notice, which in part reads:

"Whereas no time was fixed in the contract, but you leased this property by the month * * * and whereas you have paid the rent for February, you are now notified that I desire to and do terminate this lease tenancy and rental contract as of this date, March 1, 1946, and you are notified that said lease contract is now terminated as of March 1, 1946, and that I will not accept any further rent or renew this contract after March 1, 1946, and you are notified to vacate and move out, and give me possession of said premises thirty days from date of receiving this notice."

Appellants did not comply, and on April 8, on the complaint of lessor, the judge of the quarterly court issued writ of detainer, which upon hearing was dismissed, and appellee traversed to the circuit court, where parties agreed to submit without a jury, requesting a separate finding. The court found "from the evidence the lease of said building and equipment * * * was not for any fixed period, but a rental by the month, and the period of time was indefinite." He stated as facts matters about which there was no disagreement, such as prompt payment of rent as per contract, refusal to vacate, etc. As a conclusion of law the court held that appellants were tenants at will and the tenancy could be terminated by giving to defendants thirty days notice.

Appellants' exceptions to findings and conclusions were overruled, as was motion for a new trial and this appeal follows. Appellants in brief say that there is only one question for the court to pass upon: "To determine solely from the writing whether this lease is one for a fixed time or a lease for an indefinite time and running from month to month." Appellants contend that it was on its face for a fixed term relying on the fifth clause of

the lease. Appellee to the contrary, and that the writing is uncertain as to term; we shall treat the question in that light, since proof was introduced and heard without objection thereto as a whole.

Appellee admitted that rent had been paid promptly and later tendered; that appellants had not failed to meet all required conditions and terms of the lease and had not breached any of the prohibitive conditions. The proof chiefly related to clause 5. It is not claimed by appellee that the condition therein was breached; on the contrary it is shown that appellants stuck to the agreement, purchasing from appellee, who was selling Standard's products.

At the time of the contract appellee owned the premises where he had for some time operated a store and a filling station, using the Standard Oil products. It was shown that prior to and at the time of the contract appellee was in bad health and had let it be known that he desired to quit business; appellants hearing of this fact entered into negotiations to buy his business and lease the property. It is shown by the proof that after some discussion, appellee wrote the contract manually and then had it typed. Appellants admit that they agreed to it fully and completely, and say that they suggested only one provision, giving second parties a "chance" to buy the building if sold "while occupied."

Counsel for appellee presents an ingenious argument as to the effect of clause 5, relating to the use of Standard's products. As we gather, the argument is that it has no effect at all, it being said that Mr. Addington could not lease or sell to appellants something which he did not own (which appears to have been true), nor could he legally bind them to continue the Standard contract. Appellants do not claim they bought the contract, or that they ever saw it. They treated this clause as a part of the consideration of the lease, and stuck to it and are still doing so. They thought they were bound.

Testimony consisted of sharply conflicting versions of the transaction. Appellee and his wife on the one hand, and appellants on the other, testified without objection, except as to improper questions and answers. Appellee agreed that appellants had paid him $3700

for his stock of goods, without invoice. His version of the deal insofar as it related to the lease, was that he asked appellants how long they wanted the lease to run, "one year, two years, or five years." They first said "five years, and I said that if they wanted it for five years they would have to be bound as much as I was bound; that I wanted insurance for my rent, for five years, if they wanted it that long. They said 'no' they didn't want to do it that way, then I told them I would rent it by the month for $40; they accepted the contract under those terms." He was not sure that his wife was present when the agreement was made; she says she was; appellants testified that she was not. However, she in part corroborated her husband.

Blades told how the negotiation began, saying that after some discussion appellee reduced the agreement to writing, had it typed and all signed. He said the two paid $3700 cash for the stock, which he would not have done if he had only intended to stay in business for a few months. He read the contract both before and after being typed, and that the clause which contained the words "September, 1955," was the main inducement for signing the contract. He denied emphatically that anything was said by anyone in reference to a one, two or five year contract, or a renting by the month. We gather from this witness that the handwritten contract included the above date, and that there was no further discussion as to time.

Markwell testified to the same effect; he said that at no time did he tell appellee that he wanted the lease on monthly basis, and that he relied on clause 5 "absolutely." He was positive that Mrs. Addington was not present when the deal was discussed. Both say that up to March 1, 1946, they carried out the contract to buy Standard's products from appellee, since then direct from the company.

We are impressed with the suggestion in brief that it would be unreasonable to conceive that appellants paid $3700 for a stock of merchandise and equipment, then investing a considerable sum for garage equipment, if they thought they might be dispossessed in a few months, regardless of their compliance. It would be unreasonable to suppose that lessor intended to rent for a month

at a time. Persons of ordinary business qualifications do not contract in this way. A reading of the entire contract with its reservations, restrictions, conditions and terms, as to the right of purchase, etc., would not indicate a rental month by month.

We note that Mr. Addington testified that there was no reason for giving the vacating notice, other than that he became incensed at what he thought was mistreatment by one of the partners, though to our mind a matter so trivial as not to furnish reasonable grounds for dispossessing appellants. While under direct examination, after stating that appellants had taken possession, he was asked: "Then in January you became dissatisfied with this arrangement?" Answer: "It was in November on election day the difference arose." This opened the way for appellants' counsel to pursue the matter by asking: "Was it not a fact that the first difficulty you had with Markwell was responsible for your serving the notice of eviction?" Answer: "It sure was. I don't want anybody talking to me like that, and the way he treated me since." He then told of the "difficulty." He had left in the store some farm accounts, and on the date stated went to the store and could not find them where he thought he had left them. They later turned up in a desk drawer. This incident lead to some words between Markwell and Addington, who says he was threatened, which Markwell denies, though admitting there were words. This was not a sound reason for termination of the lease, any more than a conception by appellee that he had made a bad bargain. Baughman v. Portman, 11 Ky. Law Rep. 181.

While it is the general rule that we uphold the finding of the trial court where the testimony is conflicting, if there be sufficient evidence to authorize the conclusion; here we are presented with a case where there were two witnesses on each side, none of whom was impeached; where one court had dismissed the writ and another had enforced it. If there were no other features to be considered, we might be inclined to confirm the court's conclusions. However, we are compelled to lend some weight to circumstances, and to silent testimony. We have a rule of construction applied in cases where any uncertainty as to the meaning of a contract

exists. One who prepares a lease is responsible for the language used, and should not be allowed to demand an interpretation upon a basis different from the language used. 32 Am. Jur., Landlord and Tenant, 127. A lease is usually construed strongest against a lessor. Otting v. Gradsky, 294 Ky. 779, 172 S. W. 2d 554, 148 A. L. R. 580.

Considering the writing as a whole, the evidence of parties and circumstances, and applying the above rule, we are of the opinion that the lease in question was not one at will or from month to month; that what was intended by the parties was a lease for a term of years, hence the judgment is reversed with directions to set aside and enter an order dismissing the writ.

Judgment reversed.